UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| CHRISTOPHER POSHPECK, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. |
| | ) |
| HANNAFORD BROS. CO., LLC, | ) |
| | ) |
| Defendant. | ) |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff, Christopher Poshpeck, by and through the undersigned counsel, complains of Defendant Hannaford Bros. Co. LLC, as follows:

**INTRODUCTION**

1.  This Complaint arises out of the unlawful employment actions taken by Defendant Hannaford Bros. Co., LLC ("Hannaford" or "Defendant") against Plaintiff Christopher Poshpeck ("Mr. Poshpeck" or "Plaintiff") in violation of the Family and Medical Leave Act, 29 U.S.C. §2601 *et seq.* ("FMLA") and the Maine Family Medical Leave Act, 26 M.R.S.A. §843 *et seq.* ("MFMLA"). Mr. Poshpeck also brings this action to remedy disability-based discrimination and retaliation in violation of the Americans with Disabilities Act of 1990, as amended ("ADA"), 42 U.S.C § 12101, *et seq.* and the Maine Human Rights Act, 5 M.R.S.A. § 4551, *et seq.* The illegal practices alleged below were all committed within the state of Maine.

**JURISDICTION AND VENUE**

2.  Jurisdiction properly lies in this Court pursuant to 28 U.S.C. §1331 and 29 U.S.C. §2617(a)(2). This Court also has jurisdiction over this case pursuant to 28 U.S.C. §§

1331 (federal question) and 1343 (civil rights). In addition, it has supplemental jurisdiction over the state claims pursuant to 28 U.S.C. § 1367.

3. Venue properly lies in this Court pursuant to 28 U.S.C. § 1391.

## JURY DEMAND

4. Plaintiff demands trial by jury of all claims, to the extent allowed by law.

## PARTIES

5. Plaintiff Christopher Poshpeck currently resides in Wilmette, Illinois. From July 6, 2015, until his termination on February 5, 2018, he was employed by Defendant in the State of Maine, where he was also a resident. At all times relevant to this Complaint, Mr. Poshpeck performed his job in a satisfactory fashion.

6. On the date Defendant terminated him Mr. Poshpeck was an "eligible employee" as defined by the FMLA, 29 U.S.C. § 2611(2). He also was an employee entitled to leave pursuant to 26 M.R.S.A. § 843 and § 844(3). In the 12 months preceding the date of his termination, Mr. Poshpeck worked more than 1250 hours for Defendant.

7. At all relevant times, Mr. Poshpeck was a "qualified individual" as defined by 42 U.S.C. § 12111(8) of the ADA. He was also a "qualified individual with a disability" as defined by 5 M.R.S.A. § 4553(8-D).  Mr. Poshpeck was a qualified individual under the state and federal statutes because he could perform the essential functions of his employment position with or without a reasonable accommodation.

8. Defendant Hannaford Bros. Co., LLC is a regional grocery store chain licensed to do business in Maine with numerous business locations throughout the state. It employs more than 500 employees.

9. At all relevant times Defendant was a "covered" employer as defined by 42 U.S.C. § 12111(5)(A) because it engages in the business of selling groceries in multiple different states and because it has over 500 employees. It is also a "covered entity" as defined 5 M.R.S.A. § 4553(1-B).

10. Defendant Hannaford Bros. Co., LLC is an employer as defined by 29 U.S.C. § 2611(4) and 26 M.R.S.A. § 843(3)(A).

## ADMINISTRATIVE PROCEEDINGS

11. Mr. Poshpeck has timely filed and fully complied with prerequisites for administrative exhaustion required for jurisdiction in this Court under the ADA, as amended, and the Maine Human Rights Act, and thus all conditions precedent to the lawsuit within the meaning of Rule 9(c) of the Fed. R. of Civ. P. have been performed or have otherwise occurred.

12. Mr. Poshpeck filed a charge of discrimination with the Equal Employment Opportunity Commission and the Maine Human Rights Commission on May 18, 2018, and within 300 days of the conduct and action complained of. Mr. Poshpeck received his right to sue notice from the Equal Employment Commission dated March 29, 2019. (Exhibit A, attached.) He received his right to sue letter from the Maine Human Rights Commission dated March 22, 2019. (Exhibit B, attached). This lawsuit is timely filed within 90 days of each of these notices.

## FACTUAL ALLEGATIONS

13. On July 6, 2015, Hannaford hired Mr. Poshpeck as a Commodity Buyer-Produce for its grocery stores.

14. His duties included replenishment buying, which meant he had responsibilities tied to ensuring Defendant could adequately operate 7 days a week. When problems or issues

presented at work for him, they required almost immediate attention to avoid risk to Defendant's business.

### A. Mr. Poshpeck Has Physical Impairments That Substantially Limit Major Life Activities, Such That They Are Disabilities Under the ADA, As Amended, And The MHRA.

15. At all times relevant to this Complaint, Mr. Poshpeck had been diagnosed with diabetes mellitus ("diabetes"), chronic shoulder pain, and irritable bowel syndrome ("IBS").

16. Each of these medically diagnosed conditions are impairments of a physiological nature—they relate to the way his body parts function. Each of these physical impairments constitute disabilities as defined by the ADA, as amended, because they substantially limit Mr. Poshpeck's major life activities.

17. The ADA, as amended, establishes that "major life activity" and "substantial limitation" are to be construed as broadly as possible, pursuant to 42 U.S.C. § 12102(4)(A).

18. Pursuant to the ADA Amendments Act of 2008, what constitutes a major life activity includes the operation of a major bodily function, "including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." 42 U.S.C. 12102(B).

19. The legislative history to the ADA Amendments Act of 2008 states that substantially limits means, "restricted as to the conditions, manner, or duration under which they can be performed in comparison to most people." Managers Statement, 154 Cong. Rec. at S 8842. Making this determination relates, for example, to the way that individuals perform major life activities, and to the time it takes to perform them. Statement Rep. Stark, 154 Cong. Rec. at H8291; Statement of Rep. Courtney, 154 Cong. Rec. at H8296.

20. It is settled law that the MHRA should be construed and applied along the same contours as the ADA, as amended.

21. Mr. Poshpeck's diabetes substantially limits the major life activity of endocrine function.

22. Mr. Poshpeck's IBS substantially limits a major life activity because it substantially limits the operation of his bowels.

23. Mr. Poshpeck's left shoulder pain substantially limits the major life activity of working and performing the tasks and duties required of him to work as an employee of Defendant. When it flared, it also substantially limited his ability to use his arm as compared to most people.

24. These physical impairments were chronic in nature. Together they reduce the effectiveness of his body in fighting off and recovering from illnesses. At times their symptoms and the side effects from necessary medications would flare up, and make it very difficult for Mr. Poshpeck to work.

**B. Hannaford Approves Mr. Poshpeck For Intermittent Medical Leave.**

25. Mr. Poshpeck's diabetes, IBS, and chronic right shoulder pain were also serious health conditions under the FMLA and MFMLA.

26. In late 2016 the symptoms associated with Mr. Poshpeck's physical impairments regularly became severe enough that he applied for intermittent medical leave under the FMLA and MFMLA.

27. Mr. Poshpeck and his doctor completed the required paperwork and Defendant approved his request for intermittent leave starting January 4, 2017.

28. From the outset, Hannaford's administration of protected sick leave under the state and federal statutes was unclear. Hannaford never established a process to ensure Mr. Poshpeck's job was performed when his disabling conditions made him too sick to work, even though FMLA protected the leave.

29. At all times it remained Mr. Poshpeck's responsibility to ensure that the duties of his job were performed, even in the event that he took protected sick leave.

30. If Mr. Poshpeck did not work when he was sick, his work would go undone, and he would be held responsible by his supervisor. Without options, when the symptoms of his physical impairments flared such that he was entitled to protected leave, he continued to work and did the best he could because he had no other options.

**C. Mr. Poshpeck's Supervisor Is Hostile To His Disabilities.**

31. Mr. Poshpeck's supervisor was named Denise Drygza ("Ms. Drygza"). Occasionally, she told Mr. Poshpeck not to work when he was ill. The fact was, however, that she still expected him to complete his job duties, or ensure they were completed, if he took leave.

32. Consequently, although he had been approved for intermittent FMLA, Mr. Poshpeck never used it in 2017 because he was expected to work when he was sick.

33. Over the course of 2017 it became increasingly clear to Mr. Poshpeck that Ms. Drygza considered his disability-related needs a problem.

34. This was not surprising to Mr. Poshpeck. In August of 2016 he had a medical issue that required surgery. As a result, he was placed out of work for approximately three weeks. While he was out, Ms. Drygza seemed frustrated with Mr. Poshpeck because of his absence and that he did not return to work faster.

35. On May 9, 2017, Mr. Poshpeck reported to Hannaford's Leave of Absence Director that Ms. Drygza expected him to work when his disabilities flared and he was entitled to FMLA leave.

36. Mr. Poshpeck was directed to another member of Hannaford's leave team roughly a week later to discuss his concerns. He explained again that his manager had made statements to him regarding his illness and working from home that had upset him.

37. On June 13, 2017, Mr. Poshpeck received a verbal warning from Ms. Drygza alleging that he failed to communicate a heavy inventory issue in a timely manner. During the related counseling session with Ms. Drygza, Mr. Poshpeck tried to explain that he had been sick during that period of time, which she knew.

38. During the counseling session he also told Ms. Drygza that there had been a lot of stress at his desk that was negatively impacting his health. He asked if "maybe we could think about reallocating the workload." He also mentioned that he felt singled out by Ms. Drygza. Ms. Drygza did not respond to his requests.

39. One week later, on June 20, 2017, Ms. Drygza wrote up Mr. Poshpeck again for allegedly using inappropriate language with co-workers and vendors. Mr. Poshpeck refused to sign the write-up because he thought it was retaliatory.

**D. Mr. Poshpeck's Disabilities Chronically Flare In Late 2017.**

40. Mr. Poshpeck's serious medical conditions flared throughout the rest of 2017. During that time he never used the intermittent leave to which he was entitled because Ms. Drygza seemed hostile to it, and because even if he did, he remained responsible for completing his work.

41. In November and December of 2017, Mr. Poshpeck repeatedly required treatment from his disabling physical impairments.

42. In December of 2017, Mr. Poshpeck was so ill that his doctor placed him out of work from December 13 until December 20. Mr. Poshpeck continued to work as much as he could during this time because he knew that if he did not, the work would not get done, and he would be held responsible. Consequently, he did not take FMLA leave.

43. During this time, Mr. Poshpeck and his doctor discussed how his FMLA would need to be renewed soon, and that it had not been protecting him and enabling him to recover from illness the way it was intended to.

44. On December 20, 2017, they discussed increasing the length of time for each approved absence because the flare-ups were getting increasingly severe, and required lengthier recovery time.

45. Mr. Poshpeck also personally hoped that if he was approved for protected leave for longer stretches of time, it would require Hannaford to take steps to provide coverage for him while he was out, which in turn would enable him to actually take leave, and also increase his ability to get healthy.

46. After the Christmas holiday, Mr. Poshpeck again asked Ms. Drygza for help and relief for his position. He explained the stress he was under from being sick and working, and that it was negatively impacting his ability to recover. Ms. Drygza sent Mr. Poshpeck a text telling him that she might take a look at things. No one at Hannaford did anything further.

47. Mr. Poshpeck was ill on January 3-5, 2018. During this time he continued working, but it was very difficult because he was not 100%.

48. On January 5, Mr. Poshpeck went to the doctor. That afternoon Adam Lazo, a representative with Wonderful Company, which was one of the third-party vendors Mr. Poshpeck handled, emailed Ms. Drygza to wish her a Happy New Year. He closed his email by

saying, "I will say that I have about had it with [Mr. Poshpeck]...he is disorganized beyond belief and getting tired of cleaning up his messes. My two cents on this beautiful Friday."

**E. Mr. Poshpeck Reports Concerns About His Supervisor's Treatment of Him.**

49.     Because it was a new year, Hannaford notified Mr. Poshpeck that his period of approved intermittent FMLA leave was expiring.

50.     Mr. Poshpeck responded by contacting Hannaford so that he could request the necessary paperwork and reapply in accordance with what he and his doctor had previously discussed.

51.     Mr. Poshpeck reapplied for protected medical leave.

52.     Shortly after he reapplied, Linda Gregor, Hannaford's Leave of Absence Coordinator, contacted him. She wanted to know why he reapplied for intermittent leave since he never used it in 2017. Mr. Poshpeck explained to her that he still had qualifying serious health conditions, he just hadn't taken leave because Ms. Drygza had issues with him being out sick, made him work from home or made it his responsibility to find people to cover for him whenever he was sick, and no one at Hannaford was available to cover for him if he didn't work.

53.     Mr. Poshpeck provided an example to Ms. Gregor. He explained that very recently he had a doctor's appointment scheduled for 4:30 pm, which he had previously told Ms. Drygza about. When he went to leave on the day in question, however, she turned and yelled "Who is staying until 5 tonight?" Mr. Poshpeck explained that he was supposed to stay, but that he had to leave for his doctor's appointment, which was protected under FMLA. Ms. Drygza responded that leaving was unacceptable, and that if he left they would be having a conversation next week when he returned to the office.

54. Ms. Gregor seemed concerned about what Mr. Poshpeck was telling her. She asked him if he had filed a complaint with the Department of Labor. She also told him that she wanted to bring this to the attention of her supervisor, Lisa Cote.

55. Mr. Poshpeck responded that he did not like that idea. He told Ms. Gregor that he thought telling more people would only make matters worse, and that Ms. Drygza would find out and retaliate against him. Mr. Poshpeck explained that he preferred to finish getting approved for FMLA with longer leave to see if that would fix the issue.

56. Despite Mr. Poshpeck's concerns, Ms. Gregor did contact Lisa Cote, who in turn, contacted Mr. Poshpeck about the issues with Ms. Drygza that he had reported to Ms. Gregor.

57. Ms. Cote also seemed very concerned about Ms. Drygza's treatment. Like Ms. Gregor, she asked Mr. Poshpeck if he had filed a complaint with the Department of Labor.

58. She asked Mr. Poshpeck if it was okay for her to email Ms. Drygza some questions about what he had reported. Just like he had with Ms. Gregor, Mr. Poshpeck said he thought that was not a good idea because he worried Ms. Drygza would retaliate.

59. On January 12, 2018, Ms. Cote emailed Ms. Drygza about what Mr. Poshpeck had reported to her and Ms. Gregor about Ms. Drygza's hostility to his intermittent leave and his physical impairments in general. Ms. Drygza now knew that Mr. Poshpeck had reported complaints about her.

60. Three days later, on January 15, Ms. Cote also emailed a manager in Hannaford's Retail Associate Relations department. Her email stated that Mr. Poshpeck "is expressing concern about how he is being treated in regards to using his FMLA time. He indicates that he is asked to cover his time away and expected to be working from home. Although he does not want to call attention for fear of retaliation."

61.     The manager responded to Ms. Cote and offered to have Kelly Sieper, who was an employee in Hannaford's human resources department, reach out to Mr. Poshpeck discreetly and confidentially. On January 17, 2018, Kelly Sieper emailed Mr. Poshpeck and offered to meet with him confidentially about his issues with leave.

62.     In response, Mr. Poshpeck told Ms. Sieper about what was happening, and that "more recently it started getting a bit contentious relative to responsibilities for getting coverage and such."

63.     Mr. Poshpeck was increasingly worried that all this communication would find its way back to Ms. Drygza. Accordingly, he told Ms. Sieper that, "I probably do have some questions but I was going to wait till I heard back from [Ms. Cote] and company regarding some things I believe they were working on." He also said he was waiting for his doctor to submit the updated FMLA paperwork.

64.     On January 29, 2018, Mr. Poshpeck's disability caused him to get sick. He emailed Ms. Drygza, stating: "Looks like I have the Flu. I will be out a couple days I already spoke to Sawyer about any support needed and will follow up with him in the AM. I will try and hold things down as best I can."

65.     Seven days later, Ms. Drygza terminated Mr. Poshpeck's employment with Hannaford.

## COUNT I
### FMLA (Interference and Retaliation)

66.     Mr. Poshpeck re-alleges and herein incorporates by reference Paragraphs 1- 65 as if set forth in their entirety herein.

67. The FMLA makes it unlawful for "any employer to interfere with, restrain, or deny the exercise of or the attempted exercise, any right provided under this subchapter." 29 U.S.C. § 2615(a)(1).

68. The FMLA also makes it unlawful for "any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(a)(2).

69. At all times relevant to this Complaint, Defendant Hannaford had certified Mr. Poshpeck under the FMLA for protected intermittent medical leave for his serious health conditions of diabetes, IBS, and right shoulder pain.

70. During the time Mr. Poshpeck was employed by Defendant Hannaford he repeatedly suffered symptoms of the serious health conditions that qualified him to take intermittent family medical leave.

71. On occasion in 2017, when Mr. Poshpeck would engage in the protected activity of notifying Defendant Hannaford that he was sick and needed leave, he was told by his supervisor that he remained responsible for performing his job duties or finding someone else to perform them. As a result, Mr. Poshpeck was required to continue working when he was sick with a qualifying illness, and he could not use leave under the FMLA.

72. By preventing Mr. Poshpeck from utilizing protected leave that it had approved. Defendant Hannaford's conduct denied or otherwise interfered with his substantive rights under the FMLA, in violation of 29 U.S.C. § 2615(a)(1).

73. Mr. Poshpeck reported and complained to Defendant Hannaford that his supervisor was interfering with his ability to take protected medical leave in May 2017.

74. In June of 2017, just weeks after he reported his complaints about her, Mr. Poshpeck's supervisor wrote him up twice. Mr. Poshpeck believed that this was done in retaliation for his complaints about his supervisor and also in retaliation for him having been ill.

75. In January of 2018, Mr. Poshpeck again reported and complained to Defendant Hannaford that his supervisor was interfering with his ability to take protected medical leave. Because of what happened when he last complained about her, Mr. Poshpeck expressed concern that his supervisor would retaliate against him if she found out he had complained. His supervisor did learn that Mr. Poshpeck had complained about her.

76. On January 29, 2018, Mr. Poshpeck notified his supervisor that he was sick and would be taking leave. He also explained that he had done the best he could to cover the work that needed to be completed while he was out.

77. Seven days later, his supervisor fired him.

78. Defendant Hannaford terminated Mr. Poshpeck's employment in order to interfere with, restrain or deny him the exercise of, or attempted exercise of, his rights under the FMLA, in violation of 29 U.S.C. § 2615(a)(1) and (2).

79. Alternatively, Defendant Hannaford discharged Mr. Poshpeck to discriminate and/or retaliate against him because of his protected use of FMLA leave in violation of 29 U.S.C. § 2615(a)(1) and (2).

80. There are no legitimate non-discriminatory or non-retaliatory reasons for Mr. Poshpeck's termination by Defendant Hannaford.

## COUNT II
### (For Violation of the Maine Family Medical Leave Act)

81. Mr. Poshpeck re-alleges and hereby incorporates by reference Paragraphs 1-80 as if set forth in their entirety herein.

82. Mr. Poshpeck suffers from a serious health condition as defined by 26 M.R.S.A. §843(6).

83. Mr. Poshpeck was entitled to take intermittent leave under the MFMLA, 26 M.R.S.A. §844 for his serious health condition.

84. Defendant Hannaford interfered with Mr. Poshpeck's attempt to exercise his right to medical leave in violation of 26 M.R.S.A. § 847(1)

85. Defendant Hannaford discriminated against Mr. Poshpeck because he exercised his right to medical leave in violation of 26 M.R.S.A. § 847(2).

86. There are no legitimate non-discriminatory or non-retaliatory reasons for Mr. Poshpeck's termination by Defendant Hannaford.

### COUNT III
### (For Violation of the ADA)

87. Mr. Poshpeck re-alleges and incorporates paragraphs 1-86 of the Complaint by reference.

88. Defendant Hannaford violated the ADA, as amended, when it discriminatorily terminated Mr. Poshpeck's employment on the basis of his disabilities.

89. Mr. Poshpeck is a qualified individual with a disability as defined by 42 U.S.C. § 12111(8) of the ADA and 42 U.S.C. § 12131. He could perform his job's essential functions with or without an accommodation.

90. Mr. Poshpeck had a disability as defined by the ADA, as amended, of diabetes, IBS, and chronic shoulder pain at the time Defendant terminated his employment. As detailed above, these chronic conditions caused a physical impairment that substantially limited one or more of his major life activities.

91. Defendant Hannaford knew that Mr. Poshpeck had physical impairments that were disabilities under the ADA, as amended, because it had approved his application for intermittent medical leave for them approximately 13 months prior to his termination. Defendant Hannaford also knew that Mr. Poshpeck was still suffering from these disabilities when it fired him because he had a pending application for continuation of his medical leave at the time it terminated him.

92. Mr. Poshpeck's supervisor viewed and treated him negatively because of his disabling physical impairments.

93. Mr. Poshpeck's supervisor repeatedly failed to provide Mr. Poshpeck the reasonable accommodation of intermittent leave when his disabling physical impairments flared, and made him unable to work.

94. Mr. Poshpeck's supervisor terminated his employment in retaliation for him complaining about her treatment of him based on his disabling physical impairments, and for complaining about her retaliatory treatment for his engaging in activity protected by the ADA, as amended.

95. In the alternative, Mr. Poshpeck's supervisor terminated his employment because he reported being ill on January 29, 2018, and had notified her of his intent to use protected medical leave as an accommodation. This constitutes retaliation in violation of the ADA, as amended.

96. Mr. Poshpeck was treated less favorably than non-disabled employees.

97. Upon information and belief he was replaced by a non-disabled employee.

98. Defendant's discriminatory conduct has caused, and continues to cause, Mr. Poshpeck to suffer substantial physical and mental/emotional distress and inconvenience.

## COUNT IV
### (For Violation of the MHRA)

99. Mr. Poshpeck re-alleges and hereby incorporates by reference Paragraphs 1-98 as if set forth in their entirety herein.

100. At the time of his termination, Mr. Poshpeck was disabled within the meaning of the MHRA, 5 M.R.S.A. § 4553. His diabetes is specifically identified as a disability without regard to severity. 5 M.R.S.A. § 4553-A (1)(B). In addition, his IBS and chronic shoulder pain also qualify as disabilities under the MHRA.

101. Defendant Hannaford knew that Mr. Poshpeck had physical impairments that were disabilities under Maine law because it had approved his application for intermittent medical leave due to them approximately 13 months prior to his termination. Defendant Hannaford also knew that Mr. Poshpeck was still suffering from these disabilities when it fired him because he had a pending application for continuation of his medical leave through 2018 at the time it terminated him.

102. Mr. Poshpeck's supervisor was viewed and treated him negatively because of his disabling physical impairments.

103. Mr. Poshpeck's supervisor repeatedly failed to provide Mr. Poshpeck the reasonable accommodation of intermittent leave when his disabling physical impairments flared, and made him unable to work.

104. Mr. Poshpeck's supervisor terminated his employment in retaliation for him complaining about her treatment of him based on his disabling physical impairments and complaining about her retaliatory treatment for engaging in activity protected by the ADA, as amended.

105. In the alternative, Mr. Poshpeck's supervisor terminated his employment after he reported being ill on January 29, 2018, and notified her of his intent to use protected medical leave as an accommodation. This constitutes retaliation in violation of the ADA, as amended.

106. Mr. Poshpeck was treated less favorably than non-disabled employees.

107. Upon information and belief he was replaced by a non-disabled employee

108. Defendant Hannaford intentionally and wrongfully discriminated against Mr. Poshpeck on the basis of his disability in violation of the MHRA when it terminated because of his disability.

## **CLAIM FOR RELIEF**

Wherefore, Plaintiff seeks the following relief:

a. On Claim I, order Defendant Hannaford to make Plaintiff whole for lost wages and benefits and to pay liquidated damages in an amount equal to the sum of lost wages and benefits to pay prejudgment and post-judgment interest, costs, and reasonable attorneys' fees;

b. On Count II, order Defendant Hannaford to reinstate Plaintiff and to make Plaintiff whole for lost wages and benefits and to pay liquidated damages in an amount equal to $100 per day that the violation has continued, and pay all other damages, including attorneys' fees, that are identified in 26 M.R.S.A. § 848;

c. On Counts I and II, order Defendant Hannaford to pay front pay if reinstatement is not feasible;

d. On Counts III and IV, declare that Plaintiff's rights under the ADA and MHRA were violated;

e. On Counts III and IV, award any actual monetary losses sustained by the Plaintiff as a direct result of the violations;

f. On Counts III and IV, award the interest on the amount described on the items listed above, calculated at the prevailing rate;

g. On Counts III and IV, award restoration and make-whole relief for the loss of any employment benefits or other compensation denied or lost by the Plaintiff;

h. On Counts III and IV, award compensatory damages against the Defendant because of the past and future physical and mental pain and distress and inconvenience caused by its discriminatory actions;

i. On Counts III and IV, award punitive damages because the Defendant acted with malice and reckless indifference of his rights;

j. On Counts III and IV, award attorneys' fees, litigation expenses and costs incurred in obtaining relief and pursuing this action;

k. Award Post-judgment interest on all counts; and

l. Grant such additional relief as this Court deems appropriate.

                                            Respectfully submitted,

Dated: April 29, 2019                */s/ Samuel S. Riotte* _____
                                        Samuel S. Riotte
                                        McTEAGUE HIGBEE
                                        Four Union Park
                                        P.O. Box 5000
                                        Topsham, ME 04086
                                        (207) 725-5581
                                        sriotte@mcteaguehigbee.com

                                        *Counsel to Plaintiff*